# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

01 MAR 22 AM 10: 47

|  |  |  |
|---|---|---|
| STAN SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 00-BU-2769-S |
| | ) | |
| NETWORK SOLUTIONS, INC. | ) | |
| and VERISIGN, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**

MAR 22 2001

## Memorandum Opinion

In his third amended complaint in the above-styled action, Plaintiff Stan Smith seeks injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, on behalf of himself and a putative class based on allegations that Defendants Network Solutions, Inc. ("NSI") and VeriSign, Inc. ("VeriSign") have intentionally maintained an unlawful monopoly, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Now pending before the Court are the following four motions: Defendants' motion for summary judgment, or in the alternative, for dismissal of all claims (Doc. No. 22); Plaintiff's motion for class certification (Doc. No. 18); Defendants' motion to strike portions of Plaintiff's evidentiary submission in support of his motion for class certification (Doc. No. 46); and Plaintiff's motion to vacate the Court's prior order of February 1, 2001 granting Defendants' motion to strike and for protective order (Doc. No. 61). For the reasons set forth below,

70

the Court concludes that Defendants' motion for summary judgment is due to be GRANTED and that Plaintiff's motion to vacate the Court's order granting Defendants' motion to strike and for protective order is due to be DENIED. Plaintiff's motion for class certification and Defendants' motion to strike portions of Plaintiff's evidentiary submission in support of Plaintiff's motion for class certification are both MOOT.

## I. BACKGROUND

This case concerns the registration and availability of domain names, which are constructs used to identify and locate computer addresses on the Internet. Plaintiff is a computer programmer and self-styled "Internet entrepreneur." After unsuccessfully attempting to register various domain names, he filed this action claiming that Defendants NSI and VeriSign maintain an unlawful monopoly by failing to make publicly available domain names that have "expired" in the sense that the prior registrant of each name has failed to pay a registration renewal fee on or before a "record expires" date, which corresponds to the registration anniversary in the year through which the prior registrant had paid NSI to keep each name under registration.

Each entity connected to the Internet has a unique address known as an Internet Protocol, consisting of a string of numbers connected by dots that is readable by computers. For ease of human use, the domain name system was developed whereby alpha-numeric character strings correspond to Internet Protocol addresses.[1] Each domain name consists of a combination of a Top Level Domain

---

[1]For additional background information regarding the Internet and the domain name system, see Lockheed Martin Corp. v. Network Solutions, Inc., 985 F.Supp. 949, 951-53 (C.D. Cal. 1997).

("TLD") and Second Level Domain ("SLD") name, which are separated by a period known as a "dot." TLDs, which are found to the right of the dot in the address, generally, but not necessarily, indicate the country location or type of entity operating a web address. There are approximately 240 TLDs, but there are four that have primarily been used by the public in the United States. These are: ".com," often reflecting a commercial entity; ".org," which generally suggests a not-for-profit organization; ".net," indicating an entity involved in the Internet network; and ".edu." which normally corresponds to an educational institution. An SLD name is a string of numbers and/or letters immediately to the left of the dot in the address that is created and chosen by the registrant, i.e., the individual or organization operating the Internet address. For instance, in the domain name "example.com," ".com" is the TLD and "example" is the SLD name.

The registration of non-military domain names began in earnest in April 1993, when Defendant NSI commenced operating as the sole registrar of SLD names for the ".com," ".org," ".net," and ".edu" TLDs. NSI obtained that exclusive status by virtue of a contract it secured with the National Science Foundation through a competitive bid process. In 1998, the federal government, through the Department of Commerce, published a statement of policy to effect a transition to a competitive system of domain name registration. In furtherance of this policy, a private, non-profit corporation, the Internet Corporation for Assigned Names and Numbers ("ICANN"), was formed to assume responsibilities for managing the allocation of Internet Protocol numbers and the domain name system. Also as part of the transition to a competitive system, NSI's domain name registration service was divided into two separate units: a registrar and a registry. The registrar unit of

NSI is the entity through which the individuals and organizations that are the end users of the Internet apply for and register domain names. In June 1999, five companies in addition to NSI began providing competing registrar services after entering into accreditation agreements with ICANN. There are now about 80 accredited registrars in active operation. The registry unit ("the Registry") is, by contrast, the only entity of its kind. It maintains the centralized "WHOIS" database of all registered SLD names in the ".com," ".org," and ".net" TLDs, compiled from the registrations in those TLDs submitted by all registrars, including NSI's registrar unit. Thus, the Registry directly interacts with and serves registrars, rather than end-users of the Internet.

On June 8, 2000, NSI became a wholly-owned subsidiary of Defendant VeriSign, and the Registry was subsequently renamed VeriSign Global Registry Services. However, the record indicates that NSI's registrar unit and the Registry are still organized and operated as separate divisions within NSI, notwithstanding the latter division's use of the name of NSI's corporate parent. There are approximately 24 to 30 million domain names under registration. About 14 million of these have been registered through NSI's registrar unit,[2] which is more than any other individual registrar.

When an individual or an organization desires to register a domain name, it may do so through any accredited registrar. Generally, this is done through the submission of an electronic registration application submitted at a registrar's online

---

[2]Hereinafter, when the Court refers to "NSI," it is referring to NSI in its capacity as a registrar only, unless otherwise specified. NSI's registry unit, now called VeriSign Global Registry Services, which maintains the centralized database of all domain name registrations in the ".com," ".org," and ".net" TLDs, will be referred to as "the Registry."

address. The applicant first chooses one of the TLDs offered by the registrar and then creates an accompanying SLD name, thereby fashioning a potential domain name, which is then submitted electronically to the registrar for approval. However, no two SLD names within a given TLD can be identical. Accordingly, if someone submits an application for a particular domain name that already exists in the Registry WHOIS database by virtue of a prior registration, that name cannot be registered again, and the applicant is advised that the sought domain name is unavailable. The applicant may then choose to submit an application for an alternate domain name, either by changing or adding or subtracting a letter(s) or number(s) or a dash(es) to his initially submitted SLD name within the same TLD, or by going to another TLD where the initially submitted SLD name is still available.[3] If there is no existing registration for a given SLD name within a given TLD, that domain name is considered available and generally may be registered on a first-come, first served basis.

Once a registrar accepts a domain name application, it will, for a fee, have the name registered in the Registry's WHOIS database. When NSI acts as the registrar for a name, it currently charges the registrant, i.e., the individual or organization to whom a specific web address is registered, a fee of $35 per year, renewable for up to ten years.[4] Other accredited registrars, however, will register a name with the

---

[3]For instance, the domain name "example.com" is distinct from "example.org." "Example.com" is also different from "anotherexample.com," which is different from "another-example.com," which is different from "myexample.com," which is different from "example2.com," etc.

[4]As indicated previously, NSI was the registrar for all domain names registered within the ".com," ".org," ".net," and ".edu" TLDs from April 1993 until June 1999. In 1995, NSI was permitted to begin charging a registration fee, which was initially $50 per year with a required

Registry for fees that are some amount less than the fee charged by NSI.[5]  All registrars, including NSI, are uniformly required to pay a $6 per-year fee to the Registry to place and maintain each domain name registered in the Registry's WHOIS database.  The propagation of the information on the Registry's WHOIS database allows all registrars to determine almost instantaneously which domain names are already registered and therefore unavailable to others.  The public also can access the Registry's WHOIS database online, thereby allowing a person whose registration application for a particular domain name has been denied as unavailable to determine which registrar registered the name he desires with the Registry.

When NSI registers a domain name behalf of a registrant, NSI, like all other registrars, is required under its accreditation agreement with ICANN to assign the name a "record creation" date equating to the date of registration.  NSI is also required to assign the name a "record expires" date, which corresponds to the anniversary date of the registration in the year through which the registrant has paid a registration fee under its contract with NSI.  This and certain other information for each domain name registered by NSI is available to the public

---

initial registration period of two years, renewable on a yearly basis.  In 1998, NSI's registration fee was reduced to $35 per year.  Like many other registrars, NSI also provides discounts for multi-year renewals.  Before January 15, 2000, initial registrations through all registrars were required to be for a minimum two-year period; on that date, however, single-year initial registrations became available.

[5]Plaintiff has submitted as evidence printouts from the websites of 41 other registrars who offer to register a domain name for between $8.95 to $30 per year.  See Ex. D of Plaintiff's Evidentiary Submission in Opposition to Defendants' Motion to Dismiss and for Summary Judgment.

through access to NSI's online WHOIS database.[6]   Therefore, a person whose application for a particular domain name has been denied because his desired name is listed as registered through NSI can search NSI's WHOIS database to determine what entity is the registrant for the domain name and through what date such name registration has been paid for pursuant to the contract between the registrant and NSI.

Plaintiff sells computer equipment over the Internet.  He also operates a website through which he might earn commissions from Internet retailers who make sales to customers who have connected to the retailers' websites via Plaintiff's website.  Plaintiff alleges that in June 2000 and thereafter he unsuccessfully sought to register various domain names to further his existing online business ventures and to sell the rights to others on the open market.  These names, as well as numerous others, Plaintiff charges, are listed as still being under registration through NSI despite the fact that their "record expires" dates have already passed, some more than two years ago.  See Exhibits R & S to Plaintiff's Evidentiary Submission in Opposition to Defendants' Motion to Dismiss or for Summary Judgment.  Plaintiff points out that under section II(J)(5) of NSI's registrar accreditation Agreement with ICANN provides in pertinent part as follows:

> Registrar shall register SLD's to SLD holders only for fixed periods. At the conclusion of the registration period, failure by on behalf of the SLD holder to pay a renewal fee within the time specified in a second notice or reminder shall, in the absence of extenuating circumstances, result in the cancellation of the registration.

---

[6]NSI's WHOIS contains information relating to its <u>own</u> registrations only.  It should not be confused with the Registry's WHOIS database, which contains more limited information about domain name registrations from all registrars, including NSI.

After being refused permission to register such "expired" names, which Plaintiff defines as any domain name whose "record expires" date precedes the current date, Plaintiff filed this action on September 29, 2000. Plaintiff claimed, among other things, that by refusing to delete "expired" domain names, and thus precluding him and others who desire them from re-registering them, Defendants are unlawfully monopolizing the market of "expired" domain names in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. In addition to attorney's fees and costs, he now seeks injunctive relief on behalf of himself and a putative class who, like himself, have allegedly been prevented from registering "expired" domain names still under registration through NSI. More specifically, he would have this Court issue an order requiring Defendants to delete all "expired" domain names from the respective databases of NSI and the Registry, thus making the names available to the public on a first-come, first served basis.

Defendants admit that domain names registered through NSI do not immediately become available for re-registration upon the passage of their respective "record expires" dates, even if NSI has not received a renewal payment from the registrant. Once registered through any registrar, a domain name will not again become publicly available for registration unless and until it is deleted from the Registry database. This, in turn, will not happen until about six days after the registrar of record notifies the Registry that the name has been deleted from the registrar's database, and NSI acknowledges that it does not immediately delete domain names from its database for non-payment upon the passage of the name's "record expires" date. Indeed, Mike Voslow, NSI's Vice President and Treasurer, acknowledges that, as of December 31, 2000, there were approximately 163,630

registration contracts between NSI and registrants who had domain names remaining in NSI's registrar database notwithstanding that the "record expires" date for their names had passed and the renewal fee status was listed as "unpaid." This is because, NSI maintains, even if the registration remains unpaid upon the "record expires" date, NSI affords its registrants an additional "grace period" in which to renew their registrations.

NSI alleges that its grace period is usually about 55 to 85 days past the "record expires" date, but that it may vary with the circumstances of individual registrations. Such circumstances may include, NSI offers, "payment problems, communication problems, partial payments, bulk payments, billing disputes, credit card chargebacks, incorrect payments, mail address problems, payment in non-U.S. currency or from a non-U.S. bank, non-sufficient funds, and clerical errors." Defendants' Brief in Opposition to Class Certification, at xvi. It is NSI's regular practice to send, about 30 days before the "record expires" date, a renewal invoice to the registrant's billing contact of record by both postal and electronic mail, stating that a payment for renewal is due within 30 days of the date of the invoice. If NSI fails to receive a renewal payment within a few days of the "record expires" date, NSI sends a second renewal notice and invoice to the registrant's billing contact. If NSI has not received payment within 15 days of sending such notice, a third and final notice seeking payment is sent. If NSI still has not received payment within several days thereafter, NSI normally will deactivate the registrant's domain name, effectively disabling it as a web address.[7] If payment is not forthcoming

---

[7]Even after NSI deactivates a domain name, NSI is still able to retain the name on its WHOIS database. And because NSI has not deleted the name from its database, the Registry is not advised to delete it from its database, and the name thus remains unavailable for re-

within 30 days of deactivation, NSI places the domain name in line for deletion. According to Voslow, NSI engineers routinely delete domain names in bulk on unannounced dates every few weeks. NSI has submitted evidence indicating that it deleted more than 3.4 million domain names from its registrar database in the year 2000 and that it continues regularly to delete more. However, if NSI receives a renewal payment at any time prior to deletion, it accepts such payment, and the name remains under registration to the prior registrant.

## II. DISCUSSION

### A. Timing

There are four motions in this case now pending and under submission. On December 20, 2000, Plaintiff filed a motion, pursuant to Fed. R. Civ. P. 23(a) and (b)(2),[8] for class certification of his monopolization claim. (Doc. 18). In response thereto, Defendants filed on that same day a motion for summary judgment

---

registration by others.

[8]Rule 23, which governs class actions, provides, in pertinent part, as follows:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
. . .
(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . .

Fed. R. Civ. P. 23.

pursuant to Fed. R. Civ. P. 56, or in the alternative, for dismissal pursuant to Fed. R. Civ. P. 12 (Doc. 22). On January 17, 2001, Defendants also filed a motion to strike a number of newspaper articles submitted by Plaintiff as evidence in support of his motion for class certification. (Doc. 46). Finally, on February 5, 2001, Plaintiff filed a motion requesting that the Court reconsider and vacate an order it entered on February 1, 2001, which granted a motion filed by Defendants to strike all references in Plaintiff's briefs to certain e-mail communications on the grounds that they is protected by the attorney-client privilege. (Doc. 61).

As the foregoing motions are all under submission, there is a threshold issue of timing. That is, which motion should the Court resolve first, Plaintiff's motion for class certification or Defendants' potentially dispositive motion for summary judgment or, in the alternative, dismissal?[9] Although Rule 23(c)(1) requires the district court to decide the issue of class certification "as soon as practicable," it has been recognized that, at least in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or motion to dismiss prior to ruling on class certification. See Thornton v. Mercantile Stores Co., Inc., 13 F.Supp. 2d 1282, 1289 (M.D. Ala. 1998); Wright v. Schock, 742 F.2d 541, 543-44 (9th Cir. 1984). "Ruling on a dispositive motion prior to addressing class certification issues may be appropriate where there is sufficient doubt regarding the likelihood of success on the merits of a plaintiff's claims, where inefficiency would result, or where neither plaintiffs nor members of the putative class would be

---

[9]Plaintiff's motion to vacate and Defendants' motion to strike may or may not have to be resolved, as they involve rulings with respect to what evidence the Court will consider in connection with the "larger" motions for class certification and for summary judgment or dismissal.

prejudiced." <u>Thornton,</u> <u>supra</u> (citations omitted).  When a defendant moves for summary judgment prior to class certification, the defendant is assuming the risk of stare decisis protection rather than the protection of res judicata; "[w]here the defendant seeks summary judgment knowing of the possibility that other plaintiffs will enter the case and not be bound thereby, it is not for the plaintiffs or the court to deter them from assuming that risk."  <u>Id.,</u> at 1289-90.

In the instant case, the Court finds that it is appropriate to address the merits of Defendants' motion to dismiss or for summary judgment prior to addressing the issue of Plaintiff's motion for class certification, given the nature of the pending dispositive motion and the absence of prejudice to putative class members.  In addition, Defendants filed their potentially dispositive motion on the same day Plaintiff filed his motion for class certification, and Defendants have simultaneously argued that Plaintiff's motion for class certification is due to be denied.  Thus, it is clear from their actions that Defendants are willing to assume the risks of further litigation from putative class members.   Accordingly, the Court turns to Defendants' potentially dispositive motion to dismiss, or in the alternative, for summary judgment.

**B.     Defendants' Motion for Summary Judgment, or in the Alternative, Dismissal of all Claims**

Defendants have styled their potentially dispositive motion as one for summary judgment, or in the alternative, for dismissal of all claims.  Included in the record are voluminous evidentiary materials filed by both Plaintiff and Defendants in this case in support of their respective positions on Defendants' potentially dispositive motion, as well as on Plaintiff's pending motion for class certification.  The Court has considered these materials in assessing whether Defendants are

entitled to a judgment as a matter of law. Accordingly, Defendants' potentially dispositive motion must be treated as a motion for summary judgment under Rule 56, rather than for a dismissal under Rule 12(b)(6). See Fed. R. Civ. P. 12(b); Carter v. Stanton, 405 U.S. 669, 671 (1972).

1. Standards Applicable to a Motion for Summary Judgment

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101

F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

### 2. Analysis

The sole remaining claim in Plaintiff's complaint, as amended, is that Defendants have "willfully maintained monopoly power" in the market of "expired domain names," in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. That section in pertinent part provides:

> Every person[10] who shall monopolize . . . any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (footnote added). For such alleged violation, Plaintiff seeks injunctive relief, as well as costs and attorney's fees, pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26.[11]  See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 109

---

[10]As used in section 2 of the Sherman Act, the term "person" includes corporations as well as individuals. Standard Oil Co. v. United States, 221 U.S. 1, 60-61 (1910).

[11]Section 16 of the Clayton Act provides, in pertinent part, as follows:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . .

(1986); In re Chicken Antitrust Litigation American Poultry, 669 F.2d 228, 233 n.3 (5th Cir. Unit B 1982).[12]

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 481(1992) (citing United States v. Grinnell Corp., 384 U.S., 563, 570-571 (1966)). Defendants argue that they are entitled to summary judgment because, they assert, Plaintiff cannot prove either element.

An antitrust plaintiff bears the burden to show the defendant possesses monopoly power in the relevant market. Sulmeyer v. Coca Cola Co., 515 F.2d 835, 849 (5th Cir. 1975).[13] A corporation is not guilty of monopolization in violation of section 2 of the Sherman Act unless it has monopoly power, which the Supreme

---

when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . . In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

15 U.S.C. § 26.

[12]All of the post-September 30, 1981 decisions of Unit B of the former Fifth Circuit are binding precedent in the Eleventh Circuit. Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

[13]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Court has defined as the power to control prices or exclude competition. <u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 389-91 (1956). However, "[m]onopoly power does not exist in a vacuum." <u>Sulmeyer, supra</u>. Under section 2, monopoly power may not be intentionally maintained in a market that constitutes "any appreciable part" of interstate commerce. See <u>Lorain Journal Co. v. United States</u>, 342 U.S. 143, 151 n.6 (1951). "Most attempts to measure monopoly power involve quantifying the degree of concentration in a relevant market and/or the extent of a particular firm's ability to control productive capacity in that market," <u>United States Anchor Mfg., Inc. v. Rule Industries, Inc.</u>, 7 F.3d 986, 994 (11th Cir. 1993). Accordingly, defining the market is a necessary step in any analysis of monopoly power and thus an indispensable element in the consideration of any monopolization case arising under section 2. <u>United States Anchor</u>, 7 F.3d at 994 (citing <u>Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.</u>, 382 U.S. 172, 177 (1965); <u>American Key Corp. v. Cole Nat'l Corp.</u>, 762 F.2d 1569, 1579 (11th Cir. 1985)).

"The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration." <u>E. I. du Pont de Nemours & Co.</u>, 351 U.S. at 404. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." <u>National Bancard Corp. v. VISA U.S.A., Inc.</u>, 779 F.2d 592, 604 (11th Cir. 1986) (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 336 (1962)). Thus, for purposes of an antitrust claim under section 2, it is well established that the relevant market includes those commodities or services that are reasonably interchangeable by consumers for the same purposes. See <u>Grinnell</u>, 384 U.S. at 571-

72; <u>E.I. du Pont de Nemours & Co.</u>, 351 U.S. at 380-81. Ultimately, cross-elasticity of demand is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities. <u>E.I. Du Pont de Nemours & Co.</u>, <u>supra</u>.

Plaintiff urges that the relevant market in this case is "expired domain names." The record shows that, as of December 31, 2000, NSI had approximately 163,630 domain names in its WHOIS database that are still listed as registered even though their respective "record expires" dates have passed. NSI concedes that this number has since changed by some amount thereafter, as some of those "expired" names would have been deleted in the regular course of business while the "record expires" date of other names in NSI's database would pass without being the names being immediately deleted. Thus, it is undisputed that NSI retains a number of "expired" domain names, as the term is defined by Plaintiff, that is substantial. Plaintiff argues that the existence of a relevant market for these "expired" names is demonstrated by the fact that he and numerous others have undisputedly indicated their desire to register them if they were to become available. Plaintiff also seems to suggest that there can be no reasonably interchangeable substitutions for the desired expired domain names because "each domain name is unique." See Plaintiff's Brief in Opposition to Summary Judgment at 27-28. Finally, Plaintiff points to the expert testimony of Keith Leffler, Ph.D, a professor of economics. Dr. Leffler suggests that there is a "relevant economic market" for "Internet domain names controlled by NSI," see Expert Report of Keith B. Leffler, Ph.D, Plaintiff's Evidentiary Submission in Opposition to Summary Judgment, Ex. H (hereinafter

"Leffler Report") ¶¶ 6-7, and that NSI maintains "market power"[14] in that market. Id. at ¶¶ 7-8. Dr. Leffler states, "NSI's control over the release of an Internet domain name will yield market power if the value of the name to potential users exceeds the value of alternative names that are not controlled, and if NSI's control over the release of the name allows NSI to charge a price to registrants that is above the competitive price." Id. at ¶ 8.

As an initial matter, Plaintiff cannot establish that the relevant market here for antitrust purposes is the one for "expired domain names" held by NSI by showing merely that a demand exists for such names. Almost every commodity has at least some positive value, and there are, of course, many thousands (millions?) of domain names that would be desired in the event they were to become available for re-registration. This brings us to the fundamental problem with Plaintiff's position, which is that it ignores that there is no inherent difference in character, for purposes of interchangeability and cross-elasticity of demand, between domain names that are "expired" and held by NSI and those that are not. It is true in a literal sense that each domain name is unique. And one given individual domain name may be far more valuable on the open market than others. But products need not be entirely fungible to be considered part of the same relevant market. United States v. Continental Can Co., 378 U.S. 441, 449 (1964) (citing E.I. du Pont de Nemours & Co., 351 U.S. at 394). Taken to its logical conclusion, Plaintiff's argument implies that each individual domain name is a relevant market unto itself for antitrust purposes, subjecting the entity "controlling" the name at a particular

---

[14]Dr. Leffler defines "market power" as "the ability of a seller to impose a 'small but significant price increase' above the competitive level without losing substantial share of its sales." Leffler Report at ¶ 6 (quoting DOJ/FTC Merger Guidelines, April 2, 1992, section 1).

time, be it a registrar or even a legitimate registrant, to a charge of monopolization. Indeed, Dr. Leffler's analysis seems to focus upon NSI's ability to wield "market power" only over "certain expired domain names–those names with a value to some buyer that exceeds the competitive cost of registering the name." Leffler Report at ¶ 8. However, as suggested by the court in Weber v. National Football League, 112 F.Supp. 2d 667 (N.D. Ohio 2000), the virtually limitless supply of domain names affords for reasonable interchangeability.

In Weber, the plaintiff was the registrant of the domain names "jets.com" and "dolphins.com." 112 F.3d at 669. Various defendants associated with the National Football League advised the plaintiff that his registration of those names infringed upon their trademark rights. Id. Thereafter, the plaintiff brought suit claiming, among other things, that the defendants' use of infringement enforcement violated section 2 of the Sherman Act. Id. at 673. In particular, the plaintiff claimed that the defendants were attempting to monopolize the relevant market to the domain names "jets.com" and "dolphins.com." Id. The court disagreed, instead finding "sound" the defendants' argument that the relevant market had to be defined as domain names in general rather than in terms of specific marks. Id. at 674. The court reasoned that product markets are not defined in terms of trademarks and implied that there were necessarily any number of reasonably interchangeable alternate domain names to "jets.com" and "dolphins.com," given that the number of domain names is essentially limitless. Id.

Plaintiff here argues that Weber is distinguishable because there the court simply stated that the two names in question could not be considered the relevant market, while here NSI is retaining many thousands of domain names desired by

the public.  However, the <u>Weber</u> court did more than decide that the two names did not constitute the relevant market; the court reasoned that the relevant market was all domain names generally as a result of cross-elasticity of demand.  Because the number of domain names, unlike traditional commodities, is essentially unlimited, there will always be reasonable substitute names available for any given name kept out of circulation, whether by a registrar or by the registrant, regardless of whether we are talking about two names or a hundred and sixty thousand.  This reality illustrated by the fact that while the number of "expired" names in NSI's database is undisputedly substantial in a raw sense, it represents approximately .05% of all domain names under registration.

The Court would acknowledge that there are in NSI's registrar accreditation agreement with ICANN restrictions imposing certain limits upon NSI's ability to lawfully withhold deletion of domain names past their "record expires" dates. However, while such limitations could suggest that NSI acts in contravention of its accreditation agreement with NSI when it refuses to delete "expired" domain names within a certain period, Plaintiff has made no such contract-based claim in this action.[15]  Nor do the terms of NSI's accreditation agreement bear on whether expired domain names are the relevant market for purposes of the section 2 monopolization claim Plaintiff has made.  This Court finds applicable <u>Weber</u>'s reasoning and ultimate holding that the relevant product market is domain names generally.  Plaintiff makes no claim that NSI holds a monopoly over the relevant market for domain names generally or for their registration generally, nor would

---

[15]In fact, in his brief in opposition to Defendants' motion for summary judgment, Plaintiff expressly disclaims reliance upon any contract-based theory of recovery.  See Plaintiff's Brief in Opposition at 17.

the evidence support such an assertion. Because the Court concludes, as a matter of law, that the relevant market is for domain names generally, rather than "expired domain names," Plaintiff has failed to show that Defendants have monopoly power in the relevant market. Therefore, summary judgment is due on Plaintiff's section 2 monopolization claim.[16]

Based on the Court's resolution of the Defendants' motion for summary judgment, the Court concludes that Plaintiff's motion for class certification and Defendants' motion to strike certain evidentiary materials offered by Plaintiff in support of thereof are both moot. Plaintiff has also filed a motion to vacate the Court's prior order of February 1, 2001 granting Defendants' motion to strike and for protective order, which was granted on the grounds that it was protected by attorney-client privilege. The Court concludes that Plaintiff's motion to vacate is due to be denied. However, even if the Court were to consider the contents of the communication in question, it would not change the result reached by the Court. While the content of such communication could arguably constitute evidence with

---

[16]Defendants have also raised several arguments with respect to Plaintiff's alleged lack of "antitrust standing" to bring his claims for injunctive relief under the Clayton Act. See Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1448 (11th Cir. 1991). However, unlike Article III standing, see Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 1861-62 (2000), "antitrust standing" is not jurisdictional. See, e.g., Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 778 (7th Cir. 1994); Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421, 1425 n.1 (9th Cir. 1995); cf. NCAA v. Bd. of Regents, 468 U.S. 85, 97 n. 14 (1984) (Court did not address antitrust injury issue not raised by the parties); Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372, 1374 (11th Cir. 1997) (distinguishing between the constitutional considerations at the heart of Article III standing doctrine from the "prudential concerns" underlying the "antitrust standing" doctrine). Because the Court concludes that Plaintiff has sufficiently demonstrated Article III standing but that he has failed to prove a substantive antitrust violation, the Court need not address Defendants' arguments pertaining to "antitrust standing." See Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1545 & n.10 (11th Cir. 1996); L.A.P.D., Inc. v. General Elec. Corp., 132 F.3d 402, 404 (7th Cir. 1997).

regard to monopolistic intent, it has no bearing upon the Court's dispositive ruling that NSI, as a matter of law, lacks monopoly power in the relevant market.

## III. CONCLUSION

Based on the foregoing, the Court concludes as follows: Defendants' motion for summary judgment on all claims (Doc. No. 22) is due to be GRANTED; Plaintiff's motion for class certification (Doc. No. 18) and Defendants' motion to strike portions of Plaintiff's evidentiary submission in support of his motion for class certification (Doc. No. 46) are MOOT; and Plaintiff's motion to vacate the Court's prior order of February 1, 2001 granting Defendants' motion to strike and for protective order (Doc. No. 61) is due to be DENIED. This action is due to be DISMISSED WITH PREJUDICE. A separate order will be entered.

**IT IS SO ORDERED**, this 21st day of March, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE